# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>Stream TV Networks, Inc.<br>and Technovative Media, Inc.,<br><br>          Debtors.[1] | Chapter 11<br><br>Bankr. Case No. 23-10763 (MDC) |
| Stream TV Networks, Inc., *et al.*<br><br>          Plaintiffs<br>   v.<br><br>Shadron L. Stastney, *et al*.<br><br>          Defendants. | Adv.  Case No. 23-00057 (MDC)<br><br>Civil Case No. 23-mc-00135 (KSM) |

### DEFENDANTS SEECUBIC, INC., SLS HOLDINGS VI, LLC, AND SHADRON STASTNEY'S MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION OF DEBTORS FOR WITHDRAWAL OF REFERENCE

---

[1] The Debtors, along with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015).  The location of the Debtors' service address is 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

FACTUAL BACKGROUND .....................................................................................................3

A.    Stream Fails To Commercialize Its Technology Despite Raising More Than $150 Million And Working For More Than A Decade ..................................3

B.    Stream Pursues "Litigation Chaos" To Avoid Accountability To The Secured Creditors—And Multiple Courts—At All Costs ......................................5

    1.    Stream Seeks To Invalidate The Omnibus Agreement In The Court Of Chancery: The Omnibus Agreement Action ..........................................5

    2.    Stream Uses The Delaware Bankruptcy Court To Evade Judgment In The Omnibus Agreement Action: The Bad Faith Bankruptcies ..............6

        (a)    The Delaware Bankruptcy Court Recognizes Stream's Abusive Tactics And Dismisses The Voluntary Bankruptcy Action ..........................................................................................7

        (b)    The Delaware Bankruptcy Court Dismisses A Second Consecutive Attempt To Avoid The Court Of Chancery ...............7

    3.    The Delaware Supreme Court Reverses On A Discrete Legal Issue ..........8

    4.    Stream Tries Its Conspiracy Theory Again In Delaware Federal Court: The Delaware Federal Action ............................................................9

    5.    The Rajans Take Up The Chaos Strategy Individually To Again Relitigate Stream's Conspiracy Theory: The Pennsylvania Actions .........10

    6.    Hawk Exercises Its Secured Creditor Rights As Stream Seeks To Relitigate Its Defaults: The 225 Action .....................................................11

        (a)    The Court Reiterates That It Made Final Findings That Estop Stream From Relitigating Numerous Issues .......................11

        (b)    The 225 Action Reaches The Brink Of Trial ................................12

    7.    Stream Seeks To Avoid Judgment  In The 225 Action: The Third Bankruptcy ...........................................................................................13

        (a)    Stream Has Not Engaged In Ordinary Debtor Activities ...............13

        (b)    The Bankruptcy Court Has Expressed Skepticism Of Stream ...........................................................................................15

8.      Stream's Effort To Evade The Bankruptcy Court: The Withdrawal
        Motion ........................................................................................................16

ARGUMENT ......................................................................................................................17

I.      THE DEBTORS HAVE NOT MET THEIR BURDEN TO ESTABLISH CAUSE ........18

        A.      Withdrawal Is Not Warranted Under The *Pruitt* Factors.......................................18

                1.      Withdrawal Would Facilitate—Not Prevent—Forum Shopping..............18

                2.      Withdrawal Would Be A Waste Of Resources And Detract From
                        The Expediency And Uniformity Of The Bankruptcy Process .................19

                3.      The Timing Of The Motion Weighs Against Withdrawal........................20

        B.      The Remaining Considerations—Upon Which The Debtors Rely—Cannot
                Mask Debtors' Intent To Forum Shop And Do Not Support Withdrawal.............21

                1.      Stripped Of Its Artifice, The Complaint Presents Core Claims That
                        Should Be And Are Ordinarily Decided By The Bankruptcy Court .........21

                2.      The Right To A Jury Does Not Establish Grounds For Withdrawal .........24

CONCLUSION....................................................................................................................25

## **TABLE OF AUTHORITIES**

### **CASES**

*24 Hour Fitness Worldwide, Inc. v. Continental Casualty Co. (In re 24 Hour Fitness Worldwide, Inc.),*
No. 21-884-LPS, 2022 WL 605661 (D. Del. Jan. 4, 2022) ...................................................2

*400 Walnut Associates, L.P. v. 4th Walnut Associates, L.P.,*
No. 14-mc-145, 2015 WL 390455 (E.D. Pa. Jan. 28, 2015)...............................................20

*Bernstein v. Meyer, Ukovic & Scott LLP (In re 5171 Campbells Land Co.),*
No. 19-22715-CMB, 2022 WL 267357 (W.D. Pa. Jan. 28, 2022) ....................................20

*Bishop v. GNC Franchising LLC,*
403 F. Supp. 2d 411 (W.D. Pa. 2005)................................................................................23

*Bonarrigo v. LexisNexis Risk Solutions, FL, Inc.,*
No. 1:13-cv-02705, 2014 WL 65290 (M.D. Pa. Jan. 8, 2014) ..........................................20

*Continental Insurance Co. v. Stanziale (In re Emoral, Inc.),*
No. 13–5933, 2015 WL 510238 (D.N.J. Feb. 5, 2015) ......................................................20

*Dershaw v. Ciardi (In re Rite Way Electric, Inc.),*
No. 11-19633 (SR), 2017 WL 660856 (E.D. Pa. Feb. 17, 2017)..................................19, 20

*In re Earth Pride Organics, LLC,*
602 B.R. 1 (E.D. Pa. 2019) ................................................................................................17

*Feldman v. ABN AMRO Mortgage Group Inc.,*
515 B.R. 443 (E.D. Pa. 2014) ...........................................................................................25

*German American Capital Corporation v. Oxley Development Co. (In re Oxley Development Co.),*
493 B.R. 275 (Bankr. N.D. Ga. 2013) ..............................................................................22

*Hawk Investment Holdings Ltd. v. Stream TV Networks, Inc.,*
No. 2022-0930-JTL, 2022 WL 17258460 (Del. Ch. Nov. 29, 2022) ...........................9, 12

*Holber v. Portnoy (In re Portnoy),*
No. 17-38, 2017 WL 3141186 (E.D. Pa. July 24, 2017) .......................................21, 22, 25

*In re Indian Palms Associates, Ltd.,*
61 F.3d 197 (3d Cir. 1995)...................................................................................................4

*Jones v. GEICO Choice Insurance Co.,*
617 F. Supp. 3d 275 (E.D. Pa. 2022) ................................................................................23

*Katzev v. Dunavant,*
     No. Civ.A. 97–3941, 1997 WL 786461 (E.D. Pa. Nov. 20, 1997) ...................................24

*LTL Management, LLC v. Those Parties Listed on Appendix A to Complaint,*
     No. 21-20252 (FLW), 2022 WL 190673 (D.N.J. Jan. 21, 2022) .......................................21

*Marcarelli v. Grocott (In re Grocott),*
     507 B.R. 816 (E.D. Pa. 2014) .........................................................................................21

*Miller v. Vigilant Insurance Co. (In re Eagle Enterprises),*
     259 B.R. 83 (Bankr. E.D. Pa. 2001) ..........................................................................17, 22

*Pennsylvania Academy of Music v. Regitz,*
     No. 10-172, 2010 WL 4909952 (E.D. Pa. Nov. 30, 2010) ..............................................25

*Philadelphia Plaza-Phase II v. Bank of America National Trust & Savings Ass'n,*
     No. 332 May Term 2002, 2002 WL 1472338 (Pa. Ct. Comm. Pl. May 30, 2002) ...........23

*In re Pruitt,*
     910 F.2d 1160 (3d Cir. 1990) ..........................................................................................17

*Schneider v. Riddick (In re Formica Corp.),*
     305 B.R. 147 (S.D.N.Y. 2004) ........................................................................................17

*Seitz v. Rothermel,*
     638 B.R. 846 (E.D. Pa. 2022) ....................................................................................17, 25

*SNMP Research International, Inc. v. Nortel Networks, Inc. (In re Nortel Networks, Inc.),*
     539 B.R. 704 (D. Del. 2015) ...........................................................................................26

*Stanziale v. Bear Stearns, Inc. (In re Dwek),*
     No. 07–11757 (KCF), 2010 WL 2545174 (D.N.J. June 18, 2010) ..................................25

*Stream TV Networks, Inc. v. SeeCubic, Inc.,*
     250 A.3d 1016 (Del. Ch. 2020) ...........................................................................4, 5, 6, 9

*Stream TV Networks, Inc. v. SeeCubic, Inc.,*
     279 A.3d 323 (Del. 2022) .......................................................................................4, 5, 9

*Superior Contracting Group, Inc. v. Rachmale (In re LTC Holdings, Inc.),*
     No. 14-11111 (CSS), 2019 WL 4643801 (D. Del. Sept. 24, 2019) .................................20

**STATUTES AND RULES**

8 Del. C. § 225 ........................................................................................................11

10 Collier on Bankruptcy § 6003.01 .......................................................................13

28 U.S.C. § 157............................................................................17, 20, 22, 23

SeeCubic, Inc. ("SCI"), SLS Holdings VI, LLC ("SLS") and Shadron L. Stastney respectfully submit this Memorandum of Law in Opposition to the Motion of Debtors for Withdrawal of Reference (the "Motion"), filed by Stream TV Networks, Inc. ("Stream") and Technovative Media, Inc. ("Technovative"; with Stream, the "Debtors").

## PRELIMINARY STATEMENT

Stream and its secured creditors, SLS and Hawk Investment Holdings, Ltd. ("Hawk"; with SLS, the "Secured Creditors") are embroiled in a years-long legal dispute regarding Stream's 2020 default on secured debt in an amount now totaling nearly $200 million, with interest. Every court that has examined the merits has concluded that: (i) Stream borrowed tens of millions of dollars from the Secured Creditors secured by all of its assets; (ii) Stream defaulted on the secured debt after failing to commercialize its technology; and (iii) as a result, the Secured Creditors are entitled to exercise their rights and seize the pledged collateral. Ignoring those truths—and binding factual findings from courts—Stream has focused on a single goal: prevent at any cost the Secured Creditors from exercising their rights and seizing the collateral.

To avoid accountability for its undisputed defaults, Stream spent the last three years hopping from court to court, judge to judge, seeking a jurist who will rule in its favor on tired and disproven factual allegations, sometimes repackaged into different causes of actions, and sometimes repeated verbatim. With the Motion, Stream attempts to draw yet another court into what the Delaware Court of Chancery aptly described as Stream's "litigation chaos."

The Motion seeks to withdraw the reference to the Bankruptcy Court (Coleman, C.J.) with respect to a complaint (the "Complaint") filed in an adversary proceeding initiated in the Bankruptcy Court (the "Adversary Proceeding").[1] The underlying bankruptcy case—Stream's

---

[1] *See Stream TV Networks, Inc. v. Stastney*, No. 23-00057 (Bankr. E.D. Pa.) (the "Adversary

third in two years, with the prior two dismissed as bad-faith filings—is currently subject to a pending motion to dismiss, convert to chapter 7, or appoint a chapter 11 trustee. The Bankruptcy Court has already heard *six days* of argument and testimony on that motion, with two final days scheduled for this month and a decision anticipated shortly thereafter.

The bulk of the Complaint's factual allegations concern Stream's contention that most of the Defendants in the Adversary Proceeding—the Secured Creditors, individuals associated with the Secured Creditors, former independent directors of Stream, and certain Stream stockholders—unlawfully bribed and conspired with one another in late 2019 and the Spring of 2020 to take over Stream's assets through the so-called "Omnibus Agreement," a "friendly foreclosure" to resolve Stream's defaults. The Complaint conspicuously fails to note, however, that on a full factual record, the Court of Chancery *already rejected* the notion of any such conspiracy. While the Delaware Supreme Court later overturned the Court of Chancery on a discrete legal issue related to the Omnibus Agreement, it did not disturb the Court of Chancery's factual findings—indeed, it adopted them after Stream *did not appeal* them.[2] Those findings thus continue to bind Stream.[3]

The Complaint purports to assert 19 causes of action against 15 Defendants. On their face, nine of these claims are "core" bankruptcy claims, i.e., those that, by their nature, could only arise in a bankruptcy case. The remaining ten claims are a mixture of state and federal causes of action and remedies masquerading as causes of action. Relying heavily on these so-

---

Proceeding"). The Complaint is attached hereto as Exhibit 1, and cited as "¶ __."

[2] The Complaint also conspicuously fails to note that the Adversary Proceeding is not the first time Stream or individuals affiliated with it have tried to relitigate these findings. It is *at least the fourth* attempt to relitigate Stream's (debunked) conspiracy theory in nearly as many courts.

[3] The Complaint's remaining factual allegations assert that Defendants have caused Stream harm since the entry of the Delaware Supreme Court Opinion invalidating the Omnibus Agreement by purportedly not retuning Stream's assets to it, including intellectual property.

called "non-core" claims, the Debtors seek to withdraw the reference. The presence of non-core claims, however, is only one of many factors courts use to determine if withdrawal is proper, and here, those non-core claims have already been litigated or are being litigated elsewhere.

As the movants, the Debtors bear the heavy burden of demonstrating that cause exists to withdraw the reference. The Motion utterly fails to make this showing and should be denied.

## FACTUAL BACKGROUND

### A.    Stream Fails To Commercialize Its Technology Despite Raising More Than $150 Million And Working For More Than A Decade

Stream was founded in 2009 to develop and commercialize technology enabling viewers to watch 3D content without 3D glasses. Stream's operational subsidiaries, primarily Defendant SeeCubic B.V. ("SCBV"), are the research and development engine for the technology. (¶ 35.)

Stream raised funds via issuing (i) equity to angel investors and (ii) secured debt to the Secured Creditors. (*Id.*) Specifically, from 2011 to 2012, SLS loaned Stream an aggregate principal amount of $6 million pursuant to a series of promissory notes (the "SLS Notes"). (¶ 44.) In exchange for those funds, security agreements, and a pledge agreement, Stream granted SLS security interests in the "Collateral." The Collateral includes substantially all of the assets of Stream and its subsidiaries. (*Id.*) From 2014 to 2020, Hawk loaned Stream funds in excess of £ 50 million and $1.1 million via a series of promissory notes (the "Hawk Notes"). (¶ 45.) In exchange, and pursuant to security and pledge agreements, Stream granted Hawk a security interest in the Collateral. (*Id.*) The loan documentation authorized the Secured Creditors to levy on and take control of Stream's assets in the event of a default and to vote the shares of Stream's top-level subsidiary, Technovative. *See Stream TV Networks, Inc. v.*

*SeeCubic, Inc.*, 250 A.3d 1016, 1023 (Del. Ch. 2020) (the "Chancery PI Opinion").[4]

Despite the significant funding from the Secured Creditors and other investors, Stream never evolved beyond a pre-revenue, development stage business. By late 2019, Stream was insolvent. In addition to the debts owed to the Secured Creditors, Stream carried more than $16 million in trade debt and was months behind on payments to suppliers and other third parties. *Chancery PI Opinion*, 250 A.3d at 1024. In January 2020, Stream missed payroll. *Id.* In February 2020, Stream made payroll only due to an emergency infusion of capital from Hawk and another investor and by furloughing employees. *Id.* No later than February 2020, Stream defaulted on the SLS Notes and the Hawk Notes by failing to make payment when payment was due. *Id.*; *see also Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323, 327 (Del. 2022) (the "Delaware Supreme Court Opinion").

During these difficulties, the Secured Creditors and certain equity investors (who sued the Rajans for fraud and breach of fiduciary duty[5]), engaged in unsuccessful discussions with the Rajans about restructuring Stream. *Chancery PI Opinion*, 250 A.3d at 1024. As part of these discussions, the Rajans—Stream's only controlling stockholders, directors, and officers— appointed four independent Stream directors, non-party Frank Hodgson, and Defendants Kabacinski, Gola, and Gollop (the "Outside Directors"). *Id.* "None of the Outside Directors had prior ties to the Rajans, SLS, or Hawk." *Id.* After discussions broke down, SLS provided written notice of default to Stream in March 2020. *Id.*

---

[4] The Chancery PI Opinion and other cases cited in this Factual Background can be referenced and relied upon because they are subject to judicial notice. Specifically, the Court may take judicial notice of court documents in other cases—including judicial opinions—because they "provide[] competent evidence of certain facts—that a specific document was filed, that a party took a certain position, *that certain judicial findings, allegations, or admissions were made.*" *In re Indian Palms Assocs., Ltd.*, 61 F.3d 197, 205 (3d Cir. 1995) (emphasis added). Further, as a result of collateral estoppel, the findings made in these opinions bind Stream.

[5] Am. Compl., *Crawford v. Rajan*, C.A. No. 2020-0004-JTL (Mar. 25, Del. Ch. 2020), Dkt. 8.

In April 2020, the Outside Directors resumed negotiations with the Secured Creditors and equity investors. *Id.* On May 6, 2020, Gola and Gollop executed the so-called Omnibus Agreement on behalf of Stream. *Id.* at 1025. Under the Omnibus Agreement—which the Court of Chancery described as a "friendly foreclosure" on the Collateral—SLS and Hawk would accept Stream's assets into a to-be formed new entity in satisfaction of its outstanding debts. *Id.* That entity, SCI, was formed on May 20, 2020.[6] Stream's minority stockholders also received the right to exchange their shares in Stream for shares in SCI. *Chancery PI Opinion*, 250 A.3d at 1025. Stream also received the right to one million SCI shares. *Id.*

## B. Stream Pursues "Litigation Chaos" To Avoid Accountability To The Secured Creditors—And Multiple Courts—At All Costs

Thereafter, the Rajans caused Stream to attempt to undermine the Omnibus Agreement, including by fraudulently backdating corporate documents. *Id.* at 1026. When those efforts failed, Stream and the Rajans desperately sought to evade accountability and to prevent the Secured Creditors from exercising their rights to the Collateral, resulting in widespread "litigation chaos." *Delaware Supreme Court Opinion*, 279 A.3d 323 at 329. These efforts involve two Stream tactics: (i) delay adverse judgments or other rulings; and (ii) repeatedly and unabashedly attempt to relitigate issues already decided against it.

### 1. Stream Seeks To Invalidate The Omnibus Agreement In The Court Of Chancery: The Omnibus Agreement Action

On September 8, 2020, Stream sought a temporary restraining order in the Court of Chancery to block the Omnibus Agreement. *See Stream TV Networks, Inc. v. SeeCubic, Inc.*, No. 2020-07*66-JTL (Del. Ch. 2020) (the "Omnibus Agreement Action"); *Chancery PI Opinion*, 250 A.3d at 1027. SCI filed its own claims and sought a temporary restraining order.

---

[6] *See* SeeCubic, Inc., File No. 7979806, Delaware Department of State, Divisions of Corporations, Entity Search, https://icis.corp.delaware.gov/ecorp/entitysearch/namesearch.aspx.

*Chancery PI Opinion*, 250 A.3d at 1027.  After extensive discovery—which, as the Court of Chancery noted, "did not go smoothly" because of Stream and the Rajans' repeated (mis)conduct—the parties cross-moved for a preliminary injunction.  *Id.* at 1027.

On December 8, 2020, the Court of Chancery found that the Omnibus Agreement was valid and binding, *id.*, having been signed on behalf of Stream by directors Gola and Gollop.  *Id.* at 1028-34.  Significantly here, the Court of Chancery rejected Stream's assertions that the Omnibus Agreement was invalid because Gola and Gollop breached their fiduciary duties as part of a conspiracy with the Secured Creditors and equity investors.  *Id.* at 1045-46.  In particular, the court specifically found that,

> No evidence suggests that either member of the Resolution Committee [Gola and Gollop] was interested in the Omnibus Agreement or lacked independence from someone who was.  No evidence suggests that the members of the Resolution Committee acted in bad faith or for an improper purpose.  The evidence indicates that Gola and Gollop believed the Omnibus Agreement to be in the best interests of Stream and its stockholders (including the Rajan family) because it prevented Stream's creditors from foreclosing on all of its assets and leaving Stream and its stockholders with nothing.

*Id.* at 1046.  The court enjoined Stream and the Rajans from interfering with implementation of the Omnibus Agreement.

### 2.    Stream Uses The Delaware Bankruptcy Court To Evade Judgment In The Omnibus Agreement Action: The Bad Faith Bankruptcies

In the Chancery PI Opinion, the Court of Chancery noted that the evidence would support summary judgment against Stream.  *Id.* at 1046-47.  In early 2021, SCI filed a motion for summary judgment; Stream and the Rajans each filed briefs in opposition.  *Omnibus Agreement Action*, Dkts. 117, 119, 120.  Facing the almost certain prospect of summary judgment against it, Stream made its first attempt to evade a looming, adverse judicial decision.  Two days before SCI was to file its reply brief—thereby positioning the Court of Chancery to rule—Stream filed a voluntary chapter 11 bankruptcy petition, automatically halting the Omnibus Agreement Action.

*See In re Stream TV Networks, Inc.*, No. 21-10433-KBO (Bankr. D. Del. Feb. 24, 2021) (the

"Voluntary Bankruptcy Action").  SCI, SLS, and, notably, *the U.S. Trustee* moved to dismiss.

*Id.*, ECF Nos. 46, 84.

**(a)     The Delaware Bankruptcy Court Recognizes Stream's Abusive
Tactics And Dismisses The Voluntary Bankruptcy Action**

After discovery and a two-day merits hearing, Judge Owens dismissed the Voluntary

Bankruptcy Action on May 17, 2021, finding that Stream had no legitimate restructuring

purpose, was not motivated by financial distress, and was ***not*** filed with "the hope of preserving

[Stream's] business and maximizing its value for the benefit of its creditors and stakeholders."

May 17 Hr'g Tr. at 13:5–15, *Voluntary Bankruptcy Action*, ECF No. 200.  Instead, the

bankruptcy filing was made in bad faith for the purpose of using the automatic stay to evade the

Court of Chancery's anticipated order.  *Id.* at 13:16-14:1.  As the court noted, "Stream did not

come to this court as the honest but unfortunate debtor to preserve and maximize value for its

stakeholders."  *Id.* at 15:14–19.  The Voluntary Bankruptcy Action "was designed to stop

SeeCubic and [Stream's] secured creditors from fully implementing  [the Omnibus  Agreement],

to unravel it, and to avoid the Chancery Court's order . . . I will not permit the bankruptcy

process to be used in such a fashion."  *Id.* at 19:12–16.[7]

**(b)     The Delaware Bankruptcy Court Dismisses A Second
Consecutive Attempt To Avoid The Court Of Chancery**

After dismissal of the Voluntary Bankruptcy Action, Stream engaged in its second

attempt to avoid an adverse judgment from the Court of Chancery.  With the automatic stay

lifted as a result of the dismissal, briefing complete in the Court of Chancery, and an adverse

---

[7] Stream's and Mr. Rajan's scheme to misuse the bankruptcy court was so brazen that the court declined to stay its dismissal order, holding that doing so would make it "complicit in the bad faith filing."  *Id.* at 22:10–18.  The District Court affirmed Judge Owens's dismissal.  *See* Order ¶ 1, *In re Stream TV Networks, Inc.*, No. 21-00723-RGA (D. Del. Dec. 16, 2021), ECF No. 32.

7

judgment once again imminent, on May 23, 2021, three of Stream's unsecured creditors filed an involuntary chapter 7 bankruptcy petition on Stream's behalf—automatically staying the Omnibus Agreement Action again. *See In re Stream TV Networks, Inc.*, No. 21-10848-KBO (Bankr. D. Del. May 23, 2021) (the "Involuntary Bankruptcy Action"). Again, various parties moved to dismiss the petitions as having been filed in bad faith. *Involuntary Bankruptcy Action*, ECF No. 5. Tellingly, Stream aligned itself with the petitioning creditors and objected to the motions to dismiss. Relying on the same proposed plan of reorganization Judge Owens rejected in the Voluntary Bankruptcy Action, Stream encouraged the court to convert the case into a second chapter 11 case. Joinder, *id.*, ECF No. 27.

On June 10, 2021, after hearing argument, the court dismissed the Involuntary Bankruptcy Action and entered a 12-month bar order on further Stream bankruptcies. *See* Order Granting Emergency Motion of SeeCubic, Inc. and SLS Holdings VI, LLC for an Order Dismissing Involuntary Chapter 7 Case, *Involuntary Bankruptcy Action*, (Bankr. D. Del. Jun. 10, 2021), ECF No. 36. In so doing, the court did not mince words:

> [C]onsidering the totality of the facts and circumstances presented . . . it's clear to me that this proceeding was filed as ***another attempt by the parties to circumvent my dismissal order, gain some sort of litigation leverage over the secured lenders and the disputes in the Chancery Court,*** and essentially get another bite of the appl[e] to try and pursue the previously submitted plan and theories that are already considered and rejected in the prior Chapter 11 proceeding.

*Id.* at 63:18-64:6 (emphasis added).

### 3.    The Delaware Supreme Court Reverses On A Discrete Legal Issue

Once Stream's bad-faith tour through the Delaware Bankruptcy Court concluded, the Court of Chancery entered a summary judgment order and partial final judgment (the "First Chancery Partial Final Judgment"), holding that the Omnibus Agreement was valid and permanently enjoining Stream from interfering with it. Order, *Omnibus Agreement Action*, Dkt.

204.  Stream immediately appealed.  On June 15, 2022, the Delaware Supreme Court vacated the First Chancery Partial Final Judgment *solely* on the narrow legal basis that the Omnibus Agreement itself was required to be approved by Stream's Class B stockholders.  *Delaware Supreme Court Opinion,* 279 A.3d at 355.  Significantly, the Delaware Supreme Court adopted the factual findings from the Chancery PI Opinion; indeed, Stream *did not challenge* any of the Court of Chancery's factual findings on appeal.  *Id.* at 326-29.

On remand, the Court of Chancery entered a second final partial judgment (the "Second Chancery Partial Final Judgment") on August 7, 2022, declaring the Omnibus Agreement "without legal effect" but leaving undisturbed its prior factual determinations, which the Delaware Supreme Court adopted.  Order, *Omnibus Agreement Action*, Dkt. 266.  In doing so, the Court of Chancery reaffirmed that Stream's secured creditors retained their rights to the Collateral.  *See Hawk Inv. Holdings Ltd. v. Stream TV Networks, Inc.*, No. 2022-0930-JTL, 2022 WL 17258460, at *4-5 (Del. Ch. Nov. 29, 2022) (the "Collateral Estoppel Opinion").  No timely appeal was taken from the Second Chancery Partial Final Judgment.  *Id.*

### 4.    Stream Tries Its Conspiracy Theory Again In Delaware Federal Court: The Delaware Federal Action

Stream next tried to relitigate the Court of Chancery's factual findings, adopted by the Delaware Supreme Court in the District of Delaware.  Stream brought suit in the District of Delaware on June 22, 2022, against current Defendants here Stastney, Crawford, Gola, Gollop, Kabacinski, Hawk, and Morton, among others.  *See* Compl.*, Stream TV Networks, Inc. v. Stastney*, No. 22-cv-00851-CJB (D. Del. June 22, 2022), ECF No. 1 (the "Delaware Federal Action").  The operative complaint in the Delaware Federal Action rests upon Stream's assertions that the Outside Directors, Secured Creditors, and equity investors were engaged in a conspiracy to take over Stream's assets and harm Stream through the Omnibus Agreement—the

9

*same* allegations that were rejected by the Court of Chancery and in the Delaware Supreme

Court Opinion (and the *same* allegations as Stream now makes in the Adversary Proceeding

Complaint).  *See* pp. 6, 9, *supra*; Second Am. Compl., *Delaware Federal Action*, ECF No. 54.

Asserting that it was damaged by the Omnibus Agreement, Stream seeks damages on seven

alleged counts, including breach of fiduciary duty, aiding and abetting breach of fiduciary duty,

conspiracy, and tortious interference.  The Delaware Federal Action is still pending, though

stayed in light of Stream's current bankruptcy.

> **5.    The Rajans Take Up The Chaos Strategy Individually To Again
> Relitigate Stream's Conspiracy Theory: The Pennsylvania Actions**

The litigation chaos is not limited to Stream's initiation of repeated, duplicative actions.

The Rajans also personally filed suit making the same allegations.  In particular, on May 27,

2020, the Rajans filed an action in the Philadelphia Court of Common Pleas against Defendant

Crawford, a plaintiff in the Investor Lawsuit.  *Rajan v. Crawford*, No. 2000501648 (Phila. Ct.

Comm. Pl.).  The Rajans allowed this action to linger, without even serving it for nine months.

Rule To Show Cause, *id.* (Feb. 5, 2021).  Then, ignoring the permanent injunction from the First

Chancery Partial Final Judgment, on February 3, 2021, Raja Rajan filed a second but mostly

identical suit.  *Rajan v. Crawford*, No. 2102000269 (Phila. Ct. Comm. Pl.).  Shortly thereafter,

the Rajans reinstituted and began to pursue the first action.  After the cases were removed to this

District, the Rajans filed separate—but nearly identical—amended complaints.  *Compare* Am.

Compl., *Rajan v. Crawford*, No. 21-1456 (E.D. Pa. Apr. 6, 2021), ECF No. 8 *with* Am. Compl.,

*Rajan v. Crawford*, No. 21-1150 (E.D. Pa. Apr. 6, 2021), ECF No. 15.

In these cases, the Rajans alleged the same facts that Stream pressed unsuccessfully in the

Omnibus Agreement Action and that it now presses in both the Delaware Federal Action and in

the Complaint here.  In particular, the Rajans espoused Stream's debunked theory that the

Secured Creditors, Outside Directors, and equity investors unlawfully conspired to take over

Stream.  Both actions were dismissed for failure to state a claim.  Order, *Rajan v. Crawford*,

No. 21-1456 (E.D. Pa. Feb. 16, 2022), ECF No. 37;[8] Order, *Rajan v. Crawford*, No. 2102000269

(Phila. Ct. Comm. Pl. Apr. 19, 2023).

### 6.    Hawk Exercises Its Secured Creditor Rights As <br> Stream Seeks To Relitigate Its Defaults: The 225 Action

Meanwhile, after the Court of Chancery issued the Second Chancery Partial Final

Judgment, Hawk began taking steps to secure the Collateral and pursue a foreclosure sale.  In

accordance with its rights under its loan documents and the Uniform Commercial Code, on

October 17, 2022, Hawk issued a proxy notice directing that Stream's stock in Technovative be

registered in Hawk's name so that Hawk could vote to choose the board of Technovative.

Exhibit, *In re Stream TV Networks, Inc.*, No. 23-10763 (Bankr. E.D. Pa. Apr. 6, 2023), ECF

No. 83-6.  Stream refused to comply, claiming that it had converted the Hawk debt into equity

and that Hawk no longer had secured creditor rights (like the proxy right).  Hawk then filed suit

in the Delaware Court of Chancery pursuant to 8 Del. C. § 225—a Delaware statute designed to

resolve disputes over the makeup of corporate boards.  *See* Compl., *Hawk Inv. Holdings Ltd. v.

Stream TV Networks, Inc.*, No. 2022-0930-JTL (Del. Ch.), Dkt. 1 (the "225 Action").

### (a)    The Court Reiterates That It Made Final Findings <br> That Estop Stream From Relitigating Numerous Issues

Hawk moved for summary judgment on whether Stream defaulted on the Hawk Notes

and sought a ruling that Stream was collaterally estopped from relitigating several issues that had

---

[8] On appeal, the Third Circuit affirmed the dismissal as to certain counts, but remanded two counts that the District Court had adjudicated prior to the issuance of the Delaware Supreme Court Opinion.  The court remanded for the District Court to consider the effect of that opinion on collateral estoppel.  *Rajan v. Crawford*, No. 22-1719 (3d Cir. Nov. 28, 2022), ECF No. 28. The remanded case is currently stayed pending final resolution of certain of the other actions. Order, *Rajan v. Crawford*, No. 21-1456 (E.D. Pa. Jan. 11, 2023), ECF No. 57.

already been litigated—or could have been litigated—in the Omnibus Agreement Action.  On November 29, 2022, the Court of Chancery granted Hawk's motion, holding that Stream was collaterally estopped from relitigating several issues from the Omnibus Agreement Action as a result of the Second Chancery Partial Final Judgment, including "(i) the validity of the debt reflected by the Hawk Notes; (ii) Stream's default on the Hawk Notes; (iii) the validity of Hawk's creditor rights; and (iv) the condition predicate that Stream must satisfy to convert the Hawk Notes into equity."  *Collateral Estoppel Opinion*, at *15.

With regard to Stream's conspiracy theory, the court also noted that "Stream had every incentive to raise all available challenges to the validity of the secured debt that supported the Omnibus Agreement" in the Omnibus Agreement Action.  *Id.* at *16.  Indeed, Stream *did raise* the conspiracy allegations—at least in part—which the Court of Chancery responded to in finding, for example, that the Secured Creditors had no connection to the Outside Directors.  (*See* pg. 4, *supra*.)  Nonetheless, the Court of Chancery made clear that collateral estoppel barred Stream from arguing that its defaults were "manufactured" in a conspiracy between the Outside Directors, Secured Creditors, and equity investors:

> Evidencing its wily way with words, Stream argues that although it purportedly is not challenging the court's prior finding that 'a default event on the Hawk notes occurred in early 2020,' Stream nevertheless remains free to litigate its contention that there was an 'unlawful conspiracy that artificially manufactured the 2020 default through bribery and internal sabotage.'  That is another way of contending that a default never really occurred.  If Stream wanted to advance that argument, it had to do so in the Omnibus Agreement [Action].  Collateral estoppel bars Stream from advancing that argument now.

*Id.* at *17.

### (b)  The 225 Action Reaches The Brink Of Trial

Thereafter, the parties engaged in extensive discovery on remaining issues in the 225 Action, including whether Stream had converted the Hawk Notes to equity after November 2021

(and, as a result, whether Hawk still had secured creditor rights to exercise its proxy and control Technovative).  The matter was set for a one-day bench trial on March 23, 2023, with a pre-trial conference on March 16.  *See* Stipulation and [Proposed] Pre-Trial Order, *225 Action*, Dkt. 178.

### 7.    Stream Seeks To Avoid Judgment In The 225 Action: The Third Bankruptcy

Having lost on most of its defenses in the 225 Action, and facing trial only on its remaining long-shot defense, Stream made its third attempt to evade a negative ruling from the Court of Chancery.  One week before trial in the 225 Action was to occur, on March 15, 2023, Stream again filed for bankruptcy.  Since the Delaware Bankruptcy Court was plainly familiar with Stream's bad-faith abuse of the bankruptcy system, Stream went shopping for a new court and filed in the Eastern District of Pennsylvania.  *In re Stream TV Networks, Inc.*, No. 23-10763-MDC (Bankr. E.D. Pa.) (the "Third Bankruptcy").

#### (a)    Stream Has Not Engaged In Ordinary Debtor Activities

Stream has not acted as a typical debtor in the more than six months of the Third Bankruptcy, betraying that its motives for filing were again litigation tactics and not a legitimate restructuring.  When it filed, for example, Stream had no employees, no revenue, no meaningful expenditures, and no meaningful contracts.  *See* Statement of Financial Affairs, *Third Bankruptcy*, ECF No. 57; Am. Schedule G, *id.*, ECF No. 187; Am. Ch. 11 Monthly Operating Report, *id.*, ECF No. 188.  Further, Stream *still* has not filed the typical slate of "first-day motions," which are routinely filed, as the name suggests, immediately with the bankruptcy petition.  10 Collier on Bankruptcy § 6003.01.  For example, Stream has yet to put forth any proposal for—or move for approval of—debtor-in-possession financing, which would allow Stream to obtain financing in order to operate during bankruptcy (*see generally* Docket, *id.*), a revealing failure given that Stream entered bankruptcy with $2,500 in liquid assets, which have

13

dwindled to $1,700.  *See* Ch. 11 Monthly Operating Report, *id.*, ECF No. 399.

In the early days of the Third Bankruptcy, Hawk filed (i) a motion for relief from stay, seeking the court's permission to complete trial in the 225 Action; and (ii) a motion to dismiss, convert the case to chapter 7, or appoint a chapter 11 trustee.  *See* Emergency Motion for Relief from Stay, *Third Bankruptcy*, ECF No. 16; Emergency Motion Pursuant to Section 1112(b) of the Bankruptcy Code Either (A)(1) to Dismiss the Debtors' Chapter 11 Cases, *et al.*, *id.*, ECF No. 83 (together, the "Hawk Motions").  Judge Coleman has been presiding over an ongoing— and lengthy—evidentiary hearing on the Hawk Motions, which has taken place over six days already on June 26, 27, 28, and 29, and August 15 and 17.  *See* Minute Entries, *id.* at ECF Nos. 252, 268-69, 272-73, 277-78.

Afraid of the looming adverse judgment in the Court of Chancery, for several months, Stream virtually begged to keep its dispute with the Secured Creditors entirely in the bankruptcy court.  Opposing Hawk's motion for relief from stay, for example, Stream insisted in open court on June 26, 2023, that it was efficient and appropriate for Judge Coleman—rather than the Court of Chancery—to decide the validity and amount of the secured debt, including whether the Hawk Notes had been converted.  For example:

- "Everything can get resolved in this forum."  (Ex. 2 at 214:3–4.)

- "So, Your Honor, we believe it's most efficient if all the matters stay before this court…."  (*Id.* at 221:14–15.)

- "[A]s part of the claim administration process, we believe [all outstanding litigation] would be addressed, so the Court can address all of those issues in one forum as opposed to the Delaware District Court, the Delaware Chancery Court, it will all be brought into one forum and it will be more efficient for this Court to address that as opposed to piecemealing it in different forms [sic]."  (*Id.* at 187:4–11.)

Consistent with its tactics elsewhere, Stream has also sown confusion to cause delay and extend the Third Bankruptcy.  On the eve of every potentially dispositive hearing, the Debtors

have "disclosed" a new arrangement, transaction, or development purportedly evidencing its ability to reorganize (and thus why the case should not be dismissed).  For example, Stream filed a purported term sheet with Zhongsheng Group Holdings Ltd. for an equity investment of $300 million—nearly twice what Stream raised over its entire existence—one business day before the hearings on the Hawk Motions began.  *Third Bankruptcy*, ECF Nos. 252, 258.

### (b)    The Bankruptcy Court Has Expressed Skepticism Of Stream

Against this backdrop, although plainly reserving judgment, the Bankruptcy Court has expressed concern with Stream's handling of the Third Bankruptcy.  On June 29, for example, at the conclusion of the first four days of hearings on the Hawk Motions, the court warned Stream that it was "concerned about the direction of this case here" because months into it, Stream had not progressed the case as a typical, good-faith debtor would, signaling that it was "seriously considering" appointing a chapter 11 trustee.  (Ex. 3 at 167–67, 172; *see also* Ex. 4 at 102.)

More troubling is that the proceedings have brought to light serious concerns—shared by the Secured Creditors, the court, and the US Trustee—that Stream's key defense to the Hawk Motions (and center of its placeholder reorganization plan) is built upon a fabrication: the $300 million Zhongsheng term sheet.  Supp. Statement to Motion to Compel, *Third Bankruptcy*, ECF No. 307.  Not only is a $300 million equity investment in a serially bankrupt, pre-revenue company facially implausible, Hawk has reported to the court (and provided documentation) that, when contacted, Zhongsheng disclaimed *any knowledge* of Stream, the proposed term sheet, and the individual who purportedly signed the term sheet on its behalf.  Exhibit, *id.*, ECF No. 307-1.  And when pressed by the Bankruptcy Court, Stream admitted that it could produce only *one* contemporaneous document corroborating this supposed nine-figure investment—an email transmitting an alleged signature page.  (Ex. 4 at 53–55.)

8.    **Stream's Effort To Evade The**
      **Bankruptcy Court: The Withdrawal Motion**

Notwithstanding its emphatically professed desire to have all disputes heard by the

Bankruptcy Court, after her articulated concerns and skepticism, Stream now seeks to avoid it.

Specifically, on August 12, 2023—in the middle of the ongoing hearing on the Hawk Motions,

Stream and Technovative filed the Complaint, initiating the Adversary Proceeding.  Compl.,

*Adversary Proceeding*, ECF No. 1.  As described above, most of the Complaint's factual

allegations concern the alleged conspiracy leading up to the execution of the Omnibus

Agreement—the same core allegations already rejected by the Court of Chancery and already the

subject of several other litigations.  The Complaint primarily purports to assert tort and

intellectual property claims, such as tortious interference, breach of fiduciary duty, and

misappropriation of trade secrets, as well as claims seeking a determination on the validity and

amount of the Secured Creditors' secured debt, which is also integral the 225 Action.[9]

---

[9] The Complaint's remaining allegations concern the Debtor's assertions—contradicted in the Omnibus Agreement Action record—that SCI did not return Stream's assets, including intellectual property, after the Delaware Supreme Court Opinion.  Because of the complexities of the intermingled legacy Stream assets and those created/modified after SCI gained possession of those assets, the return of assets to Stream was a complex dispute, subject to multiple motions by both SCI and Stream.  *Omnibus Agreement Action*, *e.g.*, Dkts. 273, 274, 281, 282, 283, 289, 294.  SCI returned the assets to Stream in accordance with the Court of Chancery's orders resolving those motions.  *Id.*, *e.g.*, Dkts. 306, 308.  Most importantly, SCI transferred to Stream the stock of Technovative, through which Stream regained ownership over the assets because of Technovative's indirect ownership of most of the business's assets.

Moreover, the Debtors' assertions are facially undermined by their filings in the Third Bankruptcy, which admit that most of Stream's intellectual property is not owned by the Debtors, but by downstream subsidiaries.  *E.g.*, Exhibit, *Third Bankruptcy*, ECF No. 48-1.  One of those subsidiaries (SCBV) is a named defendant in the Adversary Proceeding, and Debtors assert that entity is misappropriating that intellectual property.  (*See* Compl. Counts XVIII and XIX (asserted against all defendants).)  In other words, the Complaint appears to assert that SCBV is misappropriating intellectual property *that it owns*.

In any event, as to the other Defendants, like the claims premised on Stream's Omnibus Agreement conspiracy theory, Stream's claims premised on the alleged failure to return assets/misuse of intellectual property are already subject to ongoing litigation: in the Third

On August 30, 2023—weeks after it filed the Complaint—Stream filed the Motion.  The

hearing on the Hawk Motions is scheduled for another two days, set to be completed on

September 22 and 25, 2023.  *See* Minute Entry, *Third Bankruptcy*, ECF No. 408.

## ARGUMENT

The district court may withdraw, in whole or in part, a proceeding in the bankruptcy court

"for cause shown."  28 U.S.C. § 157(d).  The "for cause" standard creates a presumption

"heavily weighted" against withdrawal; the burden is on the party seeking withdrawal to

establish cause.  *Seitz v. Rothermel*, 638 B.R. 846, 849 (E.D. Pa. 2022) (citations omitted).

In analyzing whether cause exists, courts consider a variety of factors.  *Miller v. Vigilant

Ins. Co. (In re Eagle Enters.)*, 259 B.R. 83, 87 (Bankr. E.D. Pa. 2001).  The Third Circuit

identified the following non-exhaustive factors: (1) uniformity in bankruptcy administration; (2)

economical use of the debtors' and creditors' resources; (3) reduction of forum shopping and

confusion; (4) expediency of the bankruptcy process; and (5) timing of the request for

withdrawal.  *In re Pruitt*, 910 F.2d 1160, 1168 (3d Cir. 1990) (the "*Pruitt* Factors").  In addition,

"a court's exercise of discretion to withdraw is guided by whether (i) the underlying proceeding

involves 'core' or 'non-core' claims, and (ii) any party has asserted a right to a jury trial to which

it is constitutionally entitled."  *In re Earth Pride Organics, LLC*, 602 B.R. 1, 13–14 (E.D. Pa.

2019).  The court "should employ withdrawal 'judiciously in order to prevent it from becoming

just another litigation tactic for parties eager to find a way out of'" a forum.  *Schneider v. Riddick

(In re Formica Corp.)*, 305 B.R. 147, 151 (S.D.N.Y. 2004) (citation omitted).

As an initial matter, the Debtors *expressly consented* to the jurisdiction of the bankruptcy

court over the Adversary Proceeding in the Complaint.  (¶ 10.)  That alone should end the

_____

Bankruptcy, Stream has filed multiple motions on this issue.  *Third Bankruptcy*, ECF Nos. 49,
76, 90, 98, 125.

Court's inquiry.  Even absent the Debtors' consent, however, the Debtors cannot and do not meet their burden under the Pruitt Factors.  The Motion should therefore be denied.

## I.    THE DEBTORS HAVE NOT MET THEIR BURDEN TO ESTABLISH CAUSE

### A.    Withdrawal Is Not Warranted Under The *Pruitt* Factors

#### 1.    Withdrawal Would Facilitate—Not Prevent—Forum Shopping

Stream has engaged in a pattern of forum shopping that is impossible to ignore:

1.  When the Court of Chancery indicated that it was prepared to enter summary judgment in SCI's favor in the Omnibus Agreement Action, just before briefing was complete on summary judgment motions, Stream filed for bankruptcy in Delaware to take advantage of the automatic stay and forestall judgment.  (*See* pg. 6, *supra*.)

2.  When the Voluntary Bankruptcy Action was dismissed, Stream facilitated the Involuntary Bankruptcy Action, again delaying judgment and attempting to relitigate the issues from the Voluntary Bankruptcy Action.  (*See* pg. 8, *supra*.)

3.  On the eve of trial in the 225 Action, when the Court of Chancery was poised to rule as to whether the Hawk Notes had been converted and whether as a result Hawk controlled Technovative, Stream filed the Third Stream Bankruptcy.  Instead of filing again in Delaware where extensive proceedings revealed Stream's bad-faith use of bankruptcy, Stream filed in the Eastern District of Pennsylvania.  (*See* pg. 13, *supra*.)

The Motion is a perpetuation of this pattern.  After six days of in-person hearings on the Hawk Motions over many months and two days remaining, Judge Coleman is poised to rule. Given Stream's inability to substantiate critical aspects of its defense, e.g., the Zhongsheng term sheet, the Debtors seek to start anew with this Court.  (*See* pg. 16, *supra*.)  This should not be countenanced.

Because the Debtors are clearly forum shopping, they barely discuss this factor.  Indeed, notwithstanding that it is the Debtors' burden to demonstrate entitlement to withdrawal, the Debtors' only argument as to why they are not forum shopping is that the Complaint contains non-core claims allegedly with a right to jury trial.  For the reasons described below, however, *neither* of these factors automatically requires withdrawal of the reference, nor do they weigh in

favor of the Court exercising discretion to withdraw the reference under the circumstances here. (*See* Part I.B, *infra*.)  There is no "jurisdictional" problem with the Adversary Proceeding remaining with the Bankruptcy Court until and unless a jury trial becomes necessary.  (*Id.*)

> ## 2.    Withdrawal Would Be A Waste Of Resources And Detract From The Expediency And Uniformity Of The Bankruptcy Process

Withdrawal of the reference here would be a colossal waste of resources—both for the parties and this Court—and undermine the expediency and uniformity of the bankruptcy process. Stream's court-hopping strategy has caused delay after delay (at significant expense) in the Secured Creditors' ability to enforce their rights.  Respectfully, starting over and bringing this Court up to speed on this dispute would be a significant drain on this Court's time as well as require the parties to expend more resources to assist in that endeavor.  This is Stream's purpose: to grind to a halt the Secured Creditors' ability to exercise their rights.

Relative to this Court, the Bankruptcy Court is already familiar with how the Adversary Proceeding might fit into the Debtors' bankruptcy case.  The Bankruptcy Court has presided over the Third Stream Bankruptcy for more than six months, (i) issuing decisions on motions, (ii) addressing discovery disputes, (iii) observing testimony from key witnesses, and (iv) is in the middle of considering two significant motions (one of which may be dispositive).  The Bankruptcy Court is also familiar with the interplay between the matters in that court and what the Court of Chancery is poised to address in the 225 Action.

Denial of the Motion best serves judicial economy and the parties' resources.  Where, as here, the bankruptcy court has an understanding of the estate, the proceedings, the parties, and the issues, district courts in this Circuit routinely find that concerns of judicial economy and uniform administration warrant denying withdrawal of the reference.  *E.g.*, *Dershaw v. Ciardi (In re Rite Way Elec., Inc.)*, No. 11-19633 (SR), 2017 WL 660856, at *5 (E.D. Pa. Feb. 17, 2017)

19

("Judge Raslavich is much more familiar with the relationships between [the parties] . . . [and] has a better frame with which to view how the money transfers in question relate to the estate's assets. This information may be important to understanding the nature of the claims asserted in the adversary proceedings."); *400 Walnut Assocs., L.P. v. 4th Walnut Assocs., L.P.*, No. 14-mc-145, 2015 WL 390455, at \*4 (E.D. Pa. Jan. 28, 2015) (withdrawal "would be a waste of the Bankruptcy Court's familiarity with the underlying facts and legal issues")[10]

### 3.    The Timing Of The Motion Weighs Against Withdrawal

*Pruitt*'s timing factor also weighs against withdrawal. This factor should be analyzed under the facts and circumstances of the case, with reference to "the stage of the proceedings in the Bankruptcy Court." *Superior Contracting Grp., Inc. v. Rachmale (In re LTC Holdings, Inc.)*, No. 14-11111 (CSS), 2019 WL 4643801, at \*8 (D. Del. Sept. 24, 2019) (citation omitted). Thus, while a withdrawal motion may be technically timely under 28 U.S.C. § 157, this is not "weighty enough to tip the scales" where the other considerations do not favor withdrawal. *Bernstein v. Meyer, Ukovic & Scott LLP (In re 5171 Campbells Land Co.)*, No. 19-22715-CMB, 2022 WL 267357, at \*5 (W.D. Pa. Jan. 28, 2022). This is particularly so where the motion is "at an early stage of the proceedings and dispositive motions may resolve the matter." *Id.* That is the case here, where the Adversary Proceeding is weeks old and is susceptible to a motion to dismiss on the grounds of collateral estoppel and the first-filed rule in light of its assertion of claims already litigated to finality or the subject of other pending cases, among other things. (*See* pg. 24, *infra*.)

Moreover, the Hawk Motions hearing is nearing its completion, and the resolution of those motions may have a significant impact on the Adversary Proceeding. For example, if

---

[10] *See also Cont'l Ins. Co. v. Stanziale (In re Emoral, Inc.)*, No. 13–5933, 2015 WL 510238, at \*2 (D.N.J. Feb. 5, 2015) ("Additionally, by proceeding before only one court, the economical use of the debtors' and creditors' resources will be promoted."); *Bonarrigo v. LexisNexis Risk Sols., FL, Inc.*, No. 1:13-cv-02705, 2014 WL 65290, at \*3 (M.D. Pa. Jan. 8, 2014) (same).

Hawk's motion for relief from stay is granted, the Court of Chancery is poised to rule on whether the Hawk Notes were converted to equity—something the Complaint and Motion ask this Court to do.  (*E.g.*, ¶¶ 186, 214, 217.)  Similarly, if the Bankruptcy Court dismisses the case, this could impact whether and where the Adversary Proceeding's claims are adjudicated.[11]  Indeed, the Bankruptcy Court has repeatedly stated that the Hawk Motions should and will take precedence over other issues because their resolution could significantly impact the case—if any remains—going forward.  (*E.g.*, Ex. 5 at 26–29; 43–44.)  As such, because the issues underlying the Hawk Motions and the Adversary Proceeding are intertwined, "the bankruptcy court should have an opportunity to resolve them in the first instance."  *LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint*, No. 21-20252 (FLW), 2022 WL 190673, at *6 (D.N.J. Jan. 21, 2022) (denying withdrawal where there was a pending motion to dismiss chapter 11 case).

> **B.     The Remaining Considerations—Upon Which The Debtors Rely—Cannot Mask Debtors' Intent To Forum Shop And Do Not Support Withdrawal**

Because the *Pruitt* Factors do not favor them, the Debtors' main argument in support of withdrawal is that (i) the Complaint concerns more non-core claims than core claims[12] and (ii) the Debtors have a right to a jury trial on certain of those non-core claims.  Particularly under the facts and circumstances here, these factors are insufficient to satisfy Debtors' burden.

> **1.     Stripped Of Its Artifice, The Complaint Presents Core Claims That Should Be And Are Ordinarily Decided By The Bankruptcy Court**

Bankruptcy courts are empowered to hear "all core proceedings arising under title 11, or arising in a case under title 11."  28 U.SC. § 157(b)(1).  A claim or proceeding is considered core

---

[11] *E.g.*, *Marcarelli v. Grocott (In re Grocott)*, 507 B.R. 816, 819 (E.D. Pa. 2014) ("general rule" is that dismissal of bankruptcy case results in dismissal of adversary case, but not always).

[12] While Debtors assert that whether the Complaint covers core or non-core claims is a "threshold" inquiry and the "most important factor," ample precedent in the Third Circuit makes clear that the core/non-core inquiry is treated as an additional factor and is not dispositive.  *E.g.*, *Holber v. Portnoy (In re Portnoy)*, No. 17-38, 2017 WL 3141186, at *3 (E.D. Pa. July 24, 2017).

if it "invokes a substantive right provided by title 11 or if it is a proceeding, that by its nature, could arise only in the context of a bankruptcy case." *In re Eagle Enters.*, 259 B.R. at 87 (citation omitted). The statute provides a non-exhaustive list of core proceedings including, among others: matters concerning the allowance or disallowance of claims; orders to turn over property of the estate; proceedings to regarding fraudulent conveyances; and determinations of the validity, extent, or priority of liens. *See* 28 U.S.C. § 157(b)(2). Bankruptcy courts have jurisdiction to enter final orders and judgment on core claims; as to non-core claims, absent consent of the parties, bankruptcy courts may not enter final orders or judgment *but* can hear the claims and submit proposed factual findings and conclusions of law to the district court for de novo review. *See* 28 U.S.C. § 157(c); *In re Portnoy*, 2017 WL 3141186, at *3.[13]

Here, the Debtors cast their Complaint as a non-core proceeding, asserting that the state law causes of action render the Adversary Proceeding overall to be non-core. Examination of the Complaint and its factual allegations, however, reveals that this position is misleading. As an initial matter, in a blatant attempt to support its argument by padding the Complaint with more facially non-core claims, at least *three* of Debtors' causes of action are *remedies*, not causes of action (Count II for injunctive relief, Count XVI for exemplary damages, and Count XIX for lender liability).[14] Those "claims" should be disregarded here.

Viewing the remaining 16 claims, the Motion's characterization of the Complaint as non-

---

[13] Contrary to the Debtors' suggestion, the core/non-core issue does not implicate subject matter jurisdiction. *Stern v. Marshall*, 131 S. Ct. 2594 (2011), provides that bankruptcy courts do not have authority to enter final judgment, but "nothing in the *Stern* opinion changes anything regarding whether a bankruptcy court has subject matter jurisdiction to hear a proceeding—only whether that court has constitutional authority to enter a final order in it." *German Am. Cap. Corp. v. Oxley Dev. Co. (In re Oxley Dev. Co.)*, 493 B.R. 275, 284-85 (Bankr. N.D. Ga. 2013).

[14] *See Jones v. GEICO Choice Ins. Co.*, 617 F. Supp. 3d 275, 287 (E.D. Pa. 2022) (addressing injunctive relief); *Bishop v. GNC Franchising LLC*, 403 F. Supp. 2d 411, 425 (W.D. Pa. 2005) (exemplary damages); *Phila. Plaza-Phase II v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, No. 332 May Term 2002, 2002 WL 1472338, at *7 (Pa. Ct. Comm. Pl. May 30, 2002) (lender liability).

core is disingenuous.  *First*, most of these 16 claims—nine of them, in Counts I, III, IV, VIII, IX,

XII, XIII, XIV, and XV—are core claims that are the bread and butter of bankruptcy; indeed,

many of them are *listed in the statute* defining core claims.  *E.g.*, 28 U.S.C. §§ 157(b)(2)(E)

("order to turn over property of the estate") (Count I); 157(b)(2)(B) ("allowance or disallowance

of claims" and "estimation of claims or interests") (Counts III, XV); 157(b)(2)(H) ("proceedings

to determine, avoid, or recover fraudulent conveyances") (Count IX); and 157(b)(2)(K)

("determinations of the validity, extent, or priority of liens") (Count XII).

     *Second*¸ of the seven arguably non-core, mostly state-law, claims—Counts V, VI, VII, X,

XI, XII, and XIII—nearly *all of them* are Debtors' improper attempt to either (i) relitigate issues

*already decided* on the merits by the Court of Chancery and/or (ii) concern claims already

pleaded in the Delaware Federal Action or that could be litigated there.  As to the former, for

example, Count VII—for breach of fiduciary duty—asserts that Gola and Gollop breached their

fiduciary duties to Stream by executing the Omnibus Agreement.  (*E.g.*, ¶ 197.)  That claim was

expressly rejected by the Court of Chancery after its review of the extensive evidence and

confirmed in the Collateral Estoppel Opinion.  (*See* pp. 6, 9, *supra*.)  As to the latter, examples

abound showing the undeniable overlap—sometimes near verbatim—in the Complaint and the

previously filed Delaware Federal Action.  As but one example:

| Complaint | Delaware Federal Action Second Amended Complaint (Compared To Complaint) |
|---|---|
| "Upon information and belief, Defendants knew that Gola and Gollop were on Stream's Board and that Gola and Gollop owed fiduciary duties to Stream as directors, and that signing the Omnibus Agreement would breach Gola's and Gollop's fiduciary duties." | "Upon information and belief, Defendants Stastney, Morton, Crawford, Miles, Petch, Hawk, and John Does 1-75 knew that Gola and Gollop were on ~~Stream's Board~~ Stream TV's board and that Gola and Gollop owed fiduciary duties to Stream ~~as directors~~ TV, and that signing the Omnibus Agreement would breach Gola's and Gollop's fiduciary duties." |
| "Defendants acted with knowledge of Gola's and Gollop's breaches of fiduciary duties to Stream and knowingly participated in those breaches of fiduciary | "Defendants Stastney, Morton, Crawford, Miles, Petch, Hawk, and John Does 1-75 acted with knowledge of Gola's and Gollop's breaches of fiduciary ~~duties~~ duty to |

| Complaint | Delaware Federal Action Second Amended Complaint (Compared To Complaint) |
|---|---|
| duties by encouraging Gola and Gollop to enter into the Omnibus Agreement, knowing that Gola and Gollop would receive compensation and stock in SCI in return for their actions (at least because Stastney, Crawford, and Morton had offered Gola and Gollop these benefits.)" (¶¶ 206-07.) | Stream TV and ~~knowingly~~ actively participated in those breaches of fiduciary ~~duties~~ duty by encouraging Gola and Gollop to enter into the Omnibus Agreement, knowing that Gola and Gollop would receive compensation and stock in ~~SCI~~ SeeCubic in return for their actions (at least because Stastney, Crawford, and Morton had offered Gola and Gollop these benefits.)" (DE SAC ¶¶ 144-45.) |

These claims should be disregarded because they are susceptible to dismissal on grounds that include collateral estoppel and the first-filed rule. Those rules prohibit exactly what Debtors are doing here: attempting to relitigate issues already decided, and simultaneously litigating the same claims in different courts in the hope of receiving a favorable outcome somewhere.

Even if Debtors' duplicative claims *are* considered here, the presence of non-core claims does not weigh in favor of—much less require—withdrawal. It has long been settled that "[t]he mere fact that a complaint asserts non-core claims does not mandate withdrawal.'" *24 Hour Fitness Worldwide, Inc. v. Cont'l Cas. Co. (In re 24 Hour Fitness Worldwide, Inc.)*, No. 21-884-LPS, 2022 WL 605661, at *1 (D. Del. Jan. 4, 2022) (citation omitted); *see also Katzev v. Dunavant*, No. 97–3941, 1997 WL 786461, at *5 (E.D. Pa. Nov. 20, 1997) ("Proceedings should not be withdrawn for the sole reason that they are non-core." (citation omitted)). Where, as here, a complaint has mixed claims, district courts routinely hold that judicial economy and efficiency are "best served by allowing all claims to proceed together before the bankruptcy court for pretrial and discovery purposes." *In re Portnoy*, 2017 WL 3141186, at *4. This is particularly true where—as Debtors argue—the core and non-core issues are "intertwined." *Id.*

## 2.    The Right To A Jury Does Not Establish Grounds For Withdrawal

Stream's argument that the reference should be withdrawn because it has demanded and allegedly has a right to a jury trial on some claims likewise does not overcome its failure to otherwise establish entitlement to withdrawal. "A party's constitutional right to a jury trial . . . is

24

not the determinative factor in the withdrawal analysis." *In re Portnoy*, 2017 WL 3141186, at

*5. Rather, "[d]istrict courts within the Third Circuit have consistently explained that

'[a]ssertion of a Seventh Amendment right to a jury trial, coupled with a refusal to consent to

such trial before the Bankruptcy Court, is not of itself sufficient cause for discretionary

withdrawal.'" *Id.* (second alteration original) (citation omitted)).

Even where the movant clearly has the right to a jury, courts resolve the conflict between

(i) the constitutional right to a jury and (ii) an otherwise insufficient showing of cause for

withdrawal "by maintaining the reference to the bankruptcy court, and only holding a jury trial in

the district court if the matter is not otherwise resolved before that stage." *Stanziale v. Bear

Stearns, Inc. (In re Dwek)*, No. 07–11757 (KCF), 2010 WL 2545174, at *5 (D.N.J. June 18,

2010).[15]  Indeed, courts in this Circuit routinely deny motions for withdrawal of the reference in

cases with a jury demand on the finding that judicial economy favors the bankruptcy court

overseeing pre-trial proceedings because the case may never reach trial. *E.g.*, *Feldman v. ABN

AMRO Mortg. Grp. Inc.*, 515 B.R. 443, 452 (E.D. Pa. 2014); *Pa. Acad. of Music v. Regitz*,

No. 10-172, 2010 WL 4909952, at *2 (E.D. Pa. Nov. 30, 2010).  In sum, as one court explained,

"even for non-core claims for which a jury trial is requested, a bankruptcy court is capable of

functioning in a role similar to that of a magistrate by handling pre-trial issues." *SNMP Rsch.

Int'l, Inc. v. Nortel Networks, Inc. (In re Nortel Networks, Inc.)*, 539 B.R. 704, 710 (D. Del.

2015).  The Debtors have not shown that the Bankruptcy Court is unable to do just this.

## CONCLUSION

The Court should deny the Motion.

---

[15]  *See also Seitz v. Rothermel*, 638 B.R. 846, 852 (E.D. Pa. 2022) ("'[w]ithdrawal of the
reference based on the ground that a party is entitled to a jury trial should be deferred until the
case is 'trial ready.'" (alteration in original) (citation omitted)).

Dated: September 13, 2023

Respectfully submitted,

/s/ *Davis Lee Wright*
ROBINSON & COLE LLP
Davis Lee Wright (No. 90926)
Katherine M. Fix (No. 314471)
Ryan M. Messina (No. 329835)
1650 Market Street
Suite 3030
Philadelphia, Pennsylvania 19103
Tel: (215) 398-0600
Fax: (215) 827-5982
Email: dwright@rc.com
kfix@rc.com
rmessina@rc.com

*Counsel for Defendant SLS Holdings VI, LLC*

/s/ *Emilia L. McKee Vassallo*
BALLARD SPAHR, LLP
Terence M. Grugan (No. 307211)
Emilia L. McKee Vassallo (No. 318428)
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Tel: (215) 665-8500
Fax: (215) 864-8999
Email: GruganT@ballardspahr.com
McKeeVassalloE@ballardspahr.com

*Counsel for Defendant Shadron Stastney*

/s/ *Joseph O. Larkin*
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
Joseph O. Larkin (I.D. No. 206047)
920 N. King Street, One Rodney Square
Wilmington, Delaware 19801
Tel: (302) 651-3000
Fax: (302) 651-3001
Email: joseph.larkin@skadden.com

- and -

James J. Mazza, Jr. (*pro hac vice* forthcoming)
Justin M. Winerman (*pro hac vice* forthcoming)
Rebecca L. Ritchie (*pro hac vice* forthcoming)
155 North Wacker Drive
Chicago, Illinois 60606-1720
Tel.: (312) 407-0549
Fax: (312) 407-8641
Email: james.mazza@skadden.com
justin.winerman@skadden.com
rebecca.ritchie@skadden.com

- and -

Eben P. Colby (*pro hac vice* forthcoming)
Marley Ann Brumme (*pro hac vice* forthcoming)
500 Boylston Street, 23rd Floor
Boston, Massachusetts 02116
Tel.: (617) 573-4800
Fax: (617) 573-4822
Email: eben.colby@skadden.com
marley.brumme@skadden.com

*Counsel for Defendant SeeCubic, Inc.*